UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION, INC., AMERICAN CIVIL LIBERTIES UNION & NATIONAL CONSUMER LAW CENTER<br><br>              Plaintiffs,<br>      v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION,<br><br>              Defendant. | Case No.: _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1. This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to enforce the public's right to information about the student debt collection practices of the United States Department of Education ("ED") and the impacts of those practices on student-borrowers.

2. On May 7, 2015, Plaintiffs filed a FOIA Request ("Request") seeking the release of ED records concerning ED's collection practices; the policies governing the private collection agencies ("PCAs") with which it contracts; and ED's policies for monitoring the racial impact of its collection policies and practices. A copy of Plaintiffs' Request is appended hereto as Exhibit 1.

3. More than ten months have passed since the date of the Request, and ED has failed to fulfill its obligation to make the requested records promptly available. Although it has issued two incomplete interim releases, it improperly redacted information from the records it did provide.

4. Student debt affects a wide swath of the public: nearly 42 million Americans have federal student loan debt, totaling more than $1.2 trillion dollars. U.S. Dep't of Educ., *Federal Student Aid Portfolio Summary* (Mar. 2016).[1] Over $120 billion of that debt is in default. U.S. Dep't of Educ., *Direct Loan and Federal Family Education Loan Portfolio by Loan Status* (Mar. 2016).[2]

5. Communities of color are impacted particularly harshly by student debt; Black adults are about twice as likely as white adults to have student debt. Urban Institute, *Forever in Your Debt: Who Has Student Loan Debt, and Who's Worried?* 2 (June 2013) (hereinafter "*Forever in Your Debt*").[3]

---

[1] https://studentaid.ed.gov/sa/about/data-center/student/portfolio

[2] https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/library/PortfoliobyLoanStatus.xls

[3] http://www.urban.org/sites/default/files/alfresco/publication-pdfs/412849-Forever-in-Your-Debt-Who-Has-Student-Loan-Debt-and-Who-s-Worried-.PDF

6. ED holds the vast majority of outstanding student loan debt, so that its policies and practices for servicing and collecting federal student debt have tremendous consequences for student-borrowers.

7. ED refers every eligible defaulted student loan debt to one of the PCAs with which it contracts. PCAs are debt collectors, and their remuneration depends upon the option selected by the borrower. Nonetheless, ED contracts with PCAs not only to collect money, but also to communicate with borrowers about options to resolve their debt.

8. While PCAs are supposed to counsel borrowers about the most appropriate option for the borrower's circumstances, ED's commission structure provides incentives to steer borrowers toward programs that garner the highest commissions for the PCA. This creates a conflict of interest.

9. Serious questions have been raised about ED's oversight of PCAs. In 2014, ED's Inspector General found that ED did not "effectively ensure that [PCAs] are abiding by the Federal debt collection laws and the related terms of their contractual agreements," and that ED failed to incorporate borrower complaints into its oversight of the collection agencies. U.S. Dep't of Educ., Office of Inspector Gen., *Handling of Borrower Complaints Against Private Collection Agencies: Final Audit Report* 13 (July 2014).[4]

10. Plaintiffs filed their FOIA Request seeking information about ED's relationship with PCAs, the policies that govern PCAs' debt collection activities, and the way that PCAs are compensated for those collection activities. Plaintiffs also sought information concerning ED's policies, if any, for monitoring the particular impacts of student debt on communities of color. Although this information is vital to ensuring a meaningful and informed public debate over this pressing public policy issue, ED has failed to promptly process Plaintiffs' Request and has withheld records in violation of FOIA.

---

[4] https://www2.ed.gov/about/offices/list/oig/auditreports/fy2014/a06m0012.pdf

## PARTIES

11.     Plaintiff American Civil Liberties Union ("ACLU") is a nationwide, non-profit, non-partisan organization with over 500,000 members dedicated to the constitutional principles of liberty and equality. The ACLU is committed to ensuring that the U.S. government acts in compliance with the Constitution and laws. The ACLU is also committed to principles of transparency and accountability in government and seeks to ensure that the American public is informed about the conduct of its government in matters that affect civil liberties and civil rights. Obtaining information about government activity, analyzing that information, and widely publishing and disseminating it to the press and the public (in both its raw and analyzed form) is a critical and substantial component of the ACLU's work and one of its primary activities. The ACLU has long fought for the rights of people of color, who are disproportionately burdened by student loan debt.

12.     Plaintiff American Civil Liberties Union Foundation ("ACLUF") is a separate § 501(c)(3) organization that educates the public about civil liberties and employs lawyers who provide legal representation free of charge in cases involving civil liberties.

13.     Plaintiff National Consumer Law Center ("NCLC"), a non-profit corporation founded in 1969, assists consumers, advocates, and public policymakers nationwide who use the powerful and complex tools of consumer law to ensure justice and fair treatment for all, particularly those whose poverty renders them powerless to demand accountability.  NCLC regularly issues reports, books, and newsletters on consumer issues, including student loan law, which are distributed to consumers, lawyers, academics, and other interested parties. NCLC also houses the Student Loan Borrower Assistance Project ("SLBA"), which focuses on providing information about student loan rights and responsibilities for borrowers and advocates. SLBA also seeks to increase public understanding of student lending issues and to identify policy solutions to promote access to education, lessen student debt burdens and make loan repayment more manageable.

14. Defendant United States Department of Education is a Department of the Executive Branch of the United States Government and an agency within the meaning of 5 U.S.C. § 552(f)(1). ED is headquartered in Washington, D.C.

## JURISDICTION

15. This Court has subject matter jurisdiction and personal jurisdiction over the parties pursuant to 5 U.S.C. §§ 552(a)(4)(B) and 552(a)(6)(C)(i). This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1346.

## VENUE

16. Venue is proper in this district pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §§ 1391(e) and 1402. Plaintiff NCLC has its principal place of business in this district.

## FACTUAL ALLEGATIONS

### Racial Disparities in Student Debt are Pervasive.

17. Student debt has particular significance in communities of color.

18. Compared to white adults, Black adults are approximately twice as likely to hold student debt, and Latino adults are about 1.75 times as likely. *Forever in Your Debt* 2.

19. Black bachelor's degree recipients are more likely than their white classmates to take out loans regardless of whether they attended public, private non-profit, or private for-profit institutions; Latino students are also more likely than white students to borrow for a bachelor's degree at a private non-profit or private for-profit institution. Demos, *The Debt Divide* 7-8, 13 (2015) (hereinafter "*The Debt Divide*").[5]

20. Borrowers of color are more likely to default on student loans. One study found that, compared to their white peers, the default rate for Black students fifteen years after

---
[5] http://www.demos.org/sites/default/files/publications/Mark-Debt divide Final (SF).pdf

4

graduation was more than five times as high, and the rate for Latino students was more than twice as high.  National Consumer Law Center, *The Student Loan Default Trap* 14 (2012).[6]

21. These disparities are due, in part, to the racial wealth gap that exists in this country—the average wealth of white families is approximately seven times greater than that of Black families and approximately six times greater than that of Latino families.  Jeffrey P. Thompson & Gustavo A. Suarez, *Exploring the Racial Wealth Gap Using the Survey of Consumer Finances* 9 (2015).[7]

22. Racial disparities in student debt also arise because students of color are disproportionately more likely to attend for-profit educational institutions, where debt and default rates are higher than at non-profit schools.  *The Debt Divide* 13; U.S. Dep't of Education, Federal Student Aid, *Default Rates* 1 (Nov. 2013).[8]  While Black and Latino students make up less than one-third of all college students, they represent 45% of all those attending for-profit institutions.  *The Debt Divide* 12.

23. Although they are less likely to graduate than students at other types of institutions, nearly all students who attend for-profit institutions take on debt.  *Id.* at 12-13.  Debt levels among students who receive two-year degrees from for-profit institutions are nearly as high as those who receive four-year degrees from public colleges.  *Id.* at 13.

24. Additionally, default rates are higher for students who attend for-profit institutions than for those who attend public or non-profit institutions.  U.S. Dep't of Education, Three-year Official Cohort Default Rates for Schools (Sept. 2015).[9]

---

[6] http://www.studentloanborrowerassistance.org/wp-content/uploads/2013/05/student-loan-default-trap-report.pdf

[7] http://www.federalreserve.gov/econresdata/feds/2015/files/2015076pap.pdf

[8] http://www.ifap.ed.gov/eannouncements/attachments/060614DefaultRatesforCohortYears20072011.pdf

[9] http://www2.ed.gov/offices/OSFAP/defaultmanagement/cdr.html

25. Given these disparities, Plaintiffs filed their Request seeking information about ED's policies and practices for monitoring the racial impacts of its collection practices.

**Available Evidence Shows ED is Failing to Adequately Monitor PCAs.**

26. ED has repeatedly failed to protect borrowers when PCAs seek to collect defaulted debt. PCAs' compliance with the law and their treatment of borrowers has been deeply flawed, as has ED's supervision of PCAs.

27. In 2014, both the Government Accountability Office ("GAO") and ED's own Office of the Inspector General ("OIG") concluded that ED's oversight of the PCAs was insufficient.

28. OIG found that ED "did not effectively ensure that the PCAs are abiding by the Federal debt collection laws and the related terms of their contracts." U.S. Dep't of Educ., Office of Inspector Gen., *Handling of Borrower Complaints Against Private Collection Agencies: Final Audit Report* 13 (July 2014) (hereinafter "*OIG Report*").[10]

29. OIG also found significant problems with ED's handling of borrower complaints about PCAs. *Id.* at 7-13, 15-16.

30. As part of its process of evaluating PCA performance, ED calculates a performance score for each PCA on a quarterly basis. According to the PCAs' contracts with ED, ED can add or subtract points from this score for "service quality," but the OIG Report revealed that ED does not use this category to calculate scores. *Id.* at 15. This omission persists even where ED has received multiple similar complaints about a PCA on an issue that it considers to be a concern; although the PCA contract requires a point deduction in these circumstances, ED had *never* deducted points from a PCA's score after instructing it to stop the concerning activity. *Id.*

---

[10] https://www2.ed.gov/about/offices/list/oig/auditreports/fy2014/a06m0012.pdf

31. OIG concluded that ED officials placed "insufficient emphasis on the importance of identifying, tracking, and resolving borrower complaints." *Id.* at 1.

32. The same year, GAO testimony to Congress stated that ED's oversight provides "little assurance that borrowers are provided accurate information." *Federal Student Loans: Oversight of Defaulted Loan Rehabilitation Needs Strengthening: Testimony Before the H. Subcomm. on Higher Educ. and Workforce Training, Comm. on Educ. and the Workforce*, 113th Cong. 8 (2014) (statement of Melissa Emrey-Arras).[11]  GAO found that ED had actually documented instances of PCA abuse but had failed to ensure that PCAs took any corrective action. *Id.* at 3.

33. NCLC has continued to document related problems in ED's management of PCAs and PCAs' treatment of borrowers over the course of the last several years.  It has, on many occasions, forwarded documentation of such instances to ED.

34. Plaintiffs filed their FOIA Request seeking greater transparency concerning ED's current oversight of PCAs.

35. Given the disproportionate debt burden born by communities of color, and the disproportionate default rates that the racial wealth gap creates, these failures of oversight are particularly significant for those communities.  To the extent that PCAs do not comply with federal law or with contractual requirements for treating borrowers fairly, borrowers of color will pay the price, both literally and figuratively.

**ED Has Failed to Promptly Process Plaintiffs' FOIA Request.**

36. On May 7, 2015, Plaintiffs submitted their FOIA Request to ED seeking records related to ED's policies and practices for the collection of student debt.

37. Plaintiffs' Request seeks several categories of documents:

---

[11] http://www.gao.gov/assets/670/661591.pdf

- Policies for determining whether ED's collection policies result in an adverse impact to particular racial groups and data, by borrower race, related to collection practices;

- Records created in response to the OIG Report;

- Correspondence with PCAs related to ED policies or manuals;

- Records concerning the process through which ED selects PCAs;

- Policies related to collection fees;

- Policies governing PCAs' use of wage garnishment, tax refund offsets, and other administrative offsets;

- Data concerning borrowers subject to wage garnishment, tax refund offsets, and other administrative offsets and commissions earned from these procedures;

- Records concerning or reviewing the PCAs' use of wage garnishment, tax refund offsets, and other administrative offsets, and borrowers' objections to the use of these procedures;

- Records concerning PCAs' remuneration for various resolutions of purported loan defaults; and

- Records concerning borrowers' complaints about PCAs.

38. Plaintiffs requested a waiver of all fees pursuant to 5 U.S.C. § 552(a)(4)(A)(iii), on the grounds that disclosure of the requested records is "in the public interest because it is likely to contribute significantly to the public understanding" of federal government activities and "is not primarily in the commercial interest of the requester." They also sought a waiver of fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii), on the grounds that they qualified as "representative[s] of the news media" and that the records were not sought for commercial use.

39. On May 11, 2015, ED acknowledged receipt of Plaintiffs' FOIA Request. A copy of this email is appended hereto as Exhibit 2.

40. On May 21, 2015, ED granted the request for a fee waiver.

41. On September 14, 2015, Plaintiffs sent an email to ED seeking information about when a response could be expected. The following day, ED responded that it was working to get an "interim release" to Plaintiffs' Request in the "next couple weeks."

8

42. On November 16, 2015, Plaintiffs again sent an email to ED seeking information about the status of their Request. The following day, ED responded by email that it would "work to identify an interim release for [Plaintiffs] by the end of the month."

43. On December 2, 2015, Plaintiffs sent ED an email asking for information about the promised release.

44. On December 3, 2015, ED provided Plaintiffs with an interim response containing some records responsive to one of Plaintiffs' requests and some information responsive to five other requests. A copy of the cover memorandum to that interim response is appended hereto as Exhibit 3.

45. Plaintiffs and ED exchanged several additional emails during December, January, and early February discussing specific aspects of Plaintiffs' outstanding requests.

46. On February 10, 2016, Plaintiffs sent ED a letter stating that, nearly nine months after the filing of the Request, Plaintiffs had not received a final determination and could therefore seek judicial action to compel disclosure. 5 U.S.C. § 552(a)(6)(C)(i); 34 C.F.R. § 5.21(c). Plaintiffs asked that ED provide them with a written final determination on all twenty elements of their Request by March 1, 2016.

47. On February 29, 2016, Plaintiffs received a telephone call from ED assuring them that they would receive a response on the following day, March 1.

48. On March 4, 2016, Plaintiffs received a second interim response to their Request ("Second Interim Response"). The cover letter included with that response, a copy of which is appended hereto as Exhibit 4, states:

> [T]he Department is continuing to process your request and your FOIA request case file remains open. It will not close until the Department provides you with a response regarding outstanding responsive documents. Additionally, our final release letter will contain information related to your appeal rights of the agency's decisions.

*Id.* at 6.

49. The Second Interim Response also made clear that ED has identified additional responsive records that it has not provided to Plaintiffs. With respect to one of Plaintiffs'

9

requests, the cover letter noted that ED "has identified 33 pages of responsive documents and is still currently working to fulfill this request item." *Id.* at 4. With respect to two other requests, the letter listed a number of responsive documents, did not provide them, and stated only that they were "Pending Review." *Id.* at 4-5. With respect to a fourth request, the letter noted the existence of two responsive documents and stated that they were "pending review and redactions." *Id.* at 6.

50. Thus, ED has itself recognized that its response to Plaintiffs' Request remains incomplete. *Id.* at 4-6.

### ED's Responses to Date Reveal a Failure to Monitor the Racial Impact of Collection Practices.

51. The responses Plaintiffs have received to date reveal that ED's Office of Federal Student Aid, responsible for managing federal student financial assistance programs, makes no attempt to monitor for racially adverse impact.

52. Given the well-documented racial disparities in the student loan system, Plaintiffs' Request sought data about delinquency, default, and use of various collection methods disaggregated by race. Ex. 1 at 3-4. Plaintiffs also sought "[a]ll policies, procedures, guidelines, or similar documents reflecting how the Department determines whether its collection policies result in an adverse impact to particular racial groups." Ex. 1 at 3.

53. ED's Second Interim Response asserted that "[Federal Student Aid] does not track race or data related to race" such that no "data, policies, procedures, or guidelines exist" that would be responsive to Plaintiffs' Requests 11, 12 and 13. Ex. 4 at 6. The Second Interim response does not indicate whether other offices or departments within ED might hold responsive records.

### ED Has Wrongfully Redacted the Documents it Has Provided, Causing Additional Delay.

54. Because Federal Student Aid has made clear that it makes no attempt to monitor

the racial impacts of its collection policies, it is all the more crucial that it demonstrate the existence of robust safeguards that ensure fair treatment for all borrowers when PCAs seek to collect student loan debt for profit. The public has a strong interest in understanding the policies and practices of ED and its PCAs to evaluate whether those practices are likely to contribute to racial disparities or disparately harm communities of color.

55. Nonetheless, in its Second Interim Response, ED withheld crucial portions of the records that it provided, wrongfully asserting that FOIA exempted those portions from disclosure. By improperly withholding portions of responsive documents without providing a final determination, ED's responses cause additional delay in Plaintiffs ability to challenge the withholding.

56. In the letter that ED provided with its Second Interim Response, ED stated that it was withholding information from responsive records pursuant to three statutory FOIA exemptions: 5 U.S.C. § 552(b)(4) and departmental regulation § 5.71(b); 5 U.S.C. § 552(b)(6), and 5 U.S.C. § 552(b)(7)(C). Ex. 4 at 4. There is no ED regulation § 5.71(b),[12] and ED did not actually redact any of the records it provided pursuant to any of these exemptions.

57. Instead, in the records that ED provided, it redacted information pursuant to two other FOIA exemptions: 5 U.S.C. § 552(b)(7)(E) ("Exemption 7(E)"). ED also withheld a significant amount of additional information pursuant to 5 U.S.C. § 552(b)(5) ("Exemption 5").

58. In some instances, ED's use of Exemption 7(E) is straightforwardly unlawful. Exemption 7(E) provides for the withholding of "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions

---

[12] ED may have meant instead to reference its regulation § 5.11(b), 34 C.F.R. § 5.11(b). Regardless, it did not redact any information pursuant to this regulation or the corresponding statutory exemption, 5 U.S.C. § 552(b)(4).

if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

59. ED is not a law enforcement agency.

60. The information that ED nonetheless claims to be covered by Exemption 7(E) includes the following:

- The percentage of a borrower's payment that goes to a PCA as collection costs;

- Administrative fees added to borrowers' accounts by ED;

- The application of the Fair Debt Collection Practices Act to the PCAs;

- The requirements imposed by the Fair Credit Reporting Act;

- Information in the PCA Procedures Manual concerning what a PCA must do when it receives a written complaint from a borrower;

- The address to which a PCA should forward a written inquiry from a Member of Congress or the White House;

- Information in the PCA Procedures Manual concerning how and when PCAs should locate the promissory notes that underlie student loans;

- All information in the PCA Procedures Manual concerning the steps a PCA must take before initiating the process for garnishing a borrower's wages; and

- The documentation required to demonstrate a borrower's death.

61. None of the above examples represents a legitimate instance of withholding pursuant to Exemption 7(E).

62. ED also wrongfully withheld information pursuant to Exemption 5 in the records provided as part of its Second Interim Response. Exemption 5 covers only "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).

63. Citing Exemption 5, ED withheld numerous portions of the Corrective Action Plan created in response to the OIG Report. No privilege would protect this material, which includes projected and actual task completion dates, from disclosure in litigation.

64. To the extent that ED relied on Exemptions 4, 6, and 7(C), those withholdings are also unlawful.

65. Because ED has failed to promptly process the Request while withholding crucial information, Plaintiffs suffer additional delays in their ability to challenge the withholding.

**Plaintiffs Have Exhausted Their Administrative Remedies.**

66. More than twenty working days—indeed, more than ten months—have passed since ED received Plaintiffs' Request and Plaintiffs have not received a final determination on their Request. ED's failure to timely respond to Plaintiffs' Request violates the FOIA, 5 U.S.C. § 552(a)(6)(A)(i), and the corresponding ED regulation, 34 C.F.R. § 5.21(c).

67. ED has wrongfully withheld the requested records from Plaintiffs.

68. Plaintiffs have exhausted all applicable administrative remedies. 5 U.S.C. § 552(a)(6)(C)(i); 34 C.F.R. § 5.21(c).

**CLAIM FOR RELIEF**

**Violation of Freedom of Information Act**

69. Plaintiffs incorporate the above paragraphs as if fully set forth herein.

70. Defendant ED has failed to comply with the statutory time for the processing of FOIA requests. It has now been more than ten months since the filing of the Request and ED has provided only a fraction of the responsive documents.

71. Plaintiffs have exhausted the applicable administrative remedies with respect to ED's failure to timely comply with Plaintiffs' requests.

72. Plaintiffs are entitled to injunctive relief with respect to the release and disclosure of the requested documents because Defendant ED continues to improperly withhold agency records and portions of records in violation of the FOIA. Plaintiffs will suffer irreparable injury from, and have no adequate legal remedy for, ED's illegal withholding of government documents pertaining to the subject of Plaintiffs' FOIA Request.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

A. Order Defendant ED to process immediately the requested records in their entirety;

B. Order Defendant ED to make the requested records in their entirety available to Plaintiffs promptly upon completion of its processing of such records;

C. Declare that ED's failure to disclose the records requested by Plaintiffs is unlawful;

D. Enjoin ED from withholding records responsive to the Request;

E. Enter a preliminary and permanent injunction against ED ordering the relief requested herein;

F. Award Plaintiffs their litigation costs and reasonable attorneys' fees incurred in this action;

G. Grant such other relief as the Court may deem just and proper.


Dated: March 30, 2016                    /s/ Stuart Rossman

                Stuart Rossman, BBO No. 430640
                Persis S. Yu, BBO No.685951 (application for D. Mass.
                   membership to be filed)
                National Consumer Law Center
                7 Winthrop Square, 4th Floor Boston, MA 02110
                (617) 542-8010
                srossman@nclc.org

                Dennis Parker (*pro hac vice* pending)
                Sarah Hinger (*pro hac vice* pending)
                Rachel Goodman (*pro hac vice* pending)
                American Civil Liberties Union Foundation
                125 Broad Street, 18th Fl.
                New York, NY 10004
                (212) 549-2500
                rgoodman@aclu.org

Matthew R. Segal, BBO No. 654489
Rahsaan D. Hall, BBO No. 645369
Jessie J. Rossman, BBO No. 670685
Laura Rótolo, BBO No. 665247
American Civil Liberties Union
    Foundation of Massachusetts
211 Congress Street
Boston, MA 02110
(617) 482-3170 ex. 337
jrossman@aclum.org

*Attorneys for Plaintiffs*