UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
|                                                       )
AMERICAN CIVIL LIBERTIES UNION   )
FOUNDATION, INC.,                             )
AMERICAN CIVIL LIBERTIES UNION   )
AND                                                   )
NATIONAL CONSUMER LAW CENTER )
|                                                       )
  Plaintiffs,                           )
|                                                       )
  v.                                       )  Civil Action No.:  16-10613-ADB
|                                                       )
|                                                       )
UNITED STATES DEPARTMENT OF      )
EDUCATION                                       )
|                                                       )
  Defendant.                          )
_____)

**LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS AND
COUNTERSTATEMENT TO DEFENDANT'S 56.1 STATEMENT**

**Defendant's Local Rule 56.1 Statement and Plaintiffs' Counterstatement**

**A. Plaintiff's FOIA Request**

1. On May 11, 2015, the DOE received the FOIA request ("Request") at issue in this litigation from the ACLU.  *See* Pedersen Decl., ¶ 4.

   Plaintiffs' Response: Undisputed.

2. The Request sought the following:

   (1) Any corrective action plan created by the DOE in response to the Final Audit Report of the DOE Office of Inspector General issued in July 2014, *see* U.S. Department of Education Office of Inspector General, ED-OIG/A06M0012, Handling of Borrower Complaints Against Private Collection Agencies, Final Audit Report 1-2 (2014) (the "OIG Report").  *Id.*

   (2) Any report, correspondence, or other information submitted to Congress, including but not limited to any individual member of Congress or any Congressional committee or sub-committee, in response to the OIG Report or that references the OIG Report.  *Id.*

   (3) All correspondence with any private collection agency ("PCA") regarding any interpretation, meaning, or proposed revisions of the DOE's regulations, guidance, policies, or manuals.  *Id.*

   (4) All policies, procedures, guidelines, or similar documents currently in effect concerning the calculation, assessment, or determination of collection fees charged to borrowers by the DOE or any entity acting on behalf of the DOE, including but not limited to factors used to determine whether collection fees will be added to loan balances and formulas used to calculate fee amounts.  *Id.*

   (5) All policies, procedures, guidelines, or similar documents currently in effect concerning the circumstances under which a PCA may initiate, or cause the DOE to initiate, administrative wage garnishment, pursuant to 20 U.S.C. § 1095a or any other authority.  *Id.*

   (6) All policies, procedures, guidelines, or similar documents currently in effect concerning the circumstances under which a PCA may initiate, or cause the DOE to initiate, an administrative offset, pursuant to 34 C.F.R. §§ 30.21-30.31, 682.410 or any other authority. *Id.*

   (7) All policies, procedures, guidelines, or similar documents currently in effect concerning the circumstances under which a PCA may initiate, or cause the DOE to initiate, a tax refund offset, pursuant to 34 C.F.R. § 30.33 or any other authority.  *Id.*

1

(8)     All documents indicating the number of borrowers subject to administrative wage garnishment, administrative offset, or tax refund offset between January 1, 2012 and the date of the request, including, but not be limited to, all documents indicating the number of administrative wage garnishments, administrative offsets, or tax refund offsets undertaken on the DOE's behalf by each PCA engaged by the DOE. *Id*.

(9)     All documents indicating the dollar amounts collected through administrative wage garnishment, administrative offset, or tax refund offset between January 1, 2012 and the date of the request including, but not be limited to, all documents indicating the dollar amounts collected through administrative wage garnishments, administrative offsets, or tax refund offsets undertaken on the DOE's behalf by each PCA engaged by the DOE. *Id*.

(10)    All documents reflecting any analysis, investigation, or review of the collection methods used by any PCA, individually or in the aggregate, including but not limited to, decisions by PCAs to pursue any particular resolution with a borrower (*e.g*., rehabilitation, consolidation, cancellation, administrative wage garnishment, administrative offsets, or tax refund offsets) and the frequency with which those collection methods are used. *Id*.

(11)    All policies, procedures, guidelines, or similar documents reflecting how the DOE determines whether its collection policies result in an adverse impact to particular racial groups. *Id*.

(12)    All data collected or maintained by the DOE reflecting the absolute number or percentage, by race, of borrowers whose student loans become delinquent or are in default. *Id*.

(13)    All data collected or maintained by the DOE reflecting the absolute number or percentage, by race, of borrowers with delinquent or defaulted loans who are thereafter subject to the following collection methods:

      a. Rehabilitation;
      b. Consolidation;
      c. Cancellation;
      d. Administrative Wage Garnishment;
      e. Administrative Offsets; or
      f. Tax Refund Offsets. *Id*.

(14)    All documents generated between January 1, 2012 and the date of the request concerning the process through which the DOE selects entities to engage as PCAs, including, but is not limited to, all documents used in the procurement of Default Collection Services (solicitation number: ED-FSA-13-R-001 0) to select entities to advance to Phase II of the procurement process or for final award of the PCA contract. *Id*.

(15)   Documents sufficient to show the number of administrative wage garnishments initiated between January 1, 2012 and the date of the request, pursuant to 20 U.S.C.   § 1095a and its implementing regulations or any other authority, whether initiated directly by the DOE, a PCA, or any other entity acting on the DOE's behalf.  *Id.*

(16)   All documents reflecting administrative wage garnishment proceedings initiated between January 1, 2012 and the date of the request in which the borrower raised an objection to the wage garnishment, and all records of the resolution of the asserted objection.  *Id.*

(17)   Documents sufficient to show the number of administrative offsets and tax offsets initiated between January 1, 2012 and the date of the request, pursuant to 31 C.P.R. §§ 30.20-30.35 or any other authority, whether initiated directly by the DOE, a PCA, or any other entity acting on the DOE's behalf.  *Id.*

(18)   All documents reflecting administrative offset proceedings initiated between January 1, 2012 and the date of the request in which the borrower raised an objection to the offset, and records of the resolution of the asserted objection.  *Id.*

(19)   Documents sufficient to show the fees, commissions, or other forms of remuneration received by each PCA between January 1, 2012 and the date of the request for each instance in which it resolved a purported default using the following methods:
   a. Rehabilitation;
   b. Consolidation;
   c. Cancellation;
   d. Administrative Wage Garnishment;
   e. Administrative Offsets; or
   f. Tax Refund Offsets.  *Id.*

(20)   All monthly "Contractor's Management and Fiscal Report[s]," as provided for in the Department's Default Collection Contract Statement of Work PCA Periodic Contract, containing borrower complaint information submitted by each PCA to the Department between January 1, 2012 and the date of the request.  *Id.*, ¶4.

<u>Plaintiffs' Response</u>: Undisputed.

3. On June 2, 2015, FSA held a meeting of its internal components to coordinate searching for and identifying records responsive to the Request.  *Id.*, ¶ 5.  FSA met regularly over the next several months to prepare its response.  *Id.*

<u>Plaintiffs' Response</u>: Undisputed.

4. On December 3, 2015, the DOE released a first transfer of records to the ACLU. *Id.*, ¶ 6. This response included 603 pages of records and/or information responsive to items 2, 8, 9 and 15-19 of the request, and included a request for clarification of several individual requests and asked whether the ACLU wished to prioritize particular items for production. *Id.*

   Plaintiffs' Response: Undisputed.

5. On January 20, 2016, the DOE contacted the ACLU with additional requests for clarification for items 10 and 20 of the Request. *Id.*, ¶ 7.

   Plaintiffs' Response: Undisputed.

6. On March 4, 2016, the DOE released a second transfer of records to the ACLU. *Id.*, ¶ 8. This production contained 1,723 pages of records responsive to items 1, 10 and 20 of the Request, a "no records" response on item 2, requests for clarification on items 6 and 7, and provided updates on the DOE's response to items 3, 4, 5, 11, 12, 13, 14 and 20. *Id.*

   Plaintiffs' Response: Undisputed.

7. On March 30, 2016, the ACLU filed this FOIA lawsuit claiming that the DOE improperly denied access to the records responsive to the Request. *Id.*, ¶ 9.

   Plaintiffs' Response: Undisputed.

8. In the subsequent months, the DOE worked with the ACLU to provide documents responsive to the Request while also clarifying and narrowing its scope. *Id.*, ¶ 10. FSA continued the process of gathering and releasing responsive documents and engaged in frequent conversations with the ACLU to better identify the records sought. *Id.* For example, on July 6, 2016, August 23, 2016, and January 23, 2017, the DOE participated in conference calls with the ACLU to provide updates on the DOE's processing of outstanding items of the Request and to answer questions about the data provided in previous responses. *Id.* The DOE also provided explanatory information by letter[1] and email on November 23, 2016, December 22, 2016, January 5, 2017, January 18, 2017 and February 28, 2017. *Id.* The DOE continued to release responsive records to the ACLU. *Id.* Specifically, the DOE produced interim responses on July 20, 2016, August 3, 2016, October 28, 2016, November 23, 2016, February 3, 2017, and April 11, 2017, totaling 5871 pages of responsive records. *Id.*

---

[1] Under FOIA, an agency is not obligated to provide explanation of documents, nor create documents in response to a FOIA request. *See, e.g., N.L.R.B. v. Sears, Roebuck & Co.,* 421 U.S. 132, 161-62 (1975); *Hudgins v. IRS,* 620 F. Supp. 19, 21 (D.D.C. 1985)(FOIA does not require an agency to answer questions, or create documents or opinions to an individual's request for information); nonetheless, on numerous occasions, DOE did both with the aim to provide a full response in good faith.

Plaintiffs' Response: Undisputed, although Plaintiffs note that this description omits relevant

details of the chronology, which are contained within Plaintiffs' 56.1 statement.

9.  Through regular and ongoing conversations, the DOE explained records provided to the
    ACLU and created records that explained the systems and records maintained by the DOE,
    so that the ACLU could clarify the scope of various items within Request. *Id.*, ¶ 11. As a
    result of these interactions, the ACLU eventually began identifying the actual records sought.
    *Id.*

    Plaintiffs' Response: Plaintiffs dispute that conversations between Plaintiffs and ED were

    "regular and ongoing." In fact, Plaintiffs often waited months for promised responses, as

    detailed in Plaintiffs' 56.1 statement.

10. Based on the Request and these conversations, the DOE released the following:
    (1) A five-page Corrective Action Plan developed to respond to recommendations made
        in an Office of Inspector General (OIG) audit issued on July, 2014, responding to
        borrower complaints against PCAs.
    (2) 145 pages of the DOE's standard contract with PCAs.
    (3) 75 page analysis of FSA's review of PCA collection methods.
    (4) 27 pages of Administrative Wage Garnishment ("AWG") technical procedures.
    (5) 390 pages of training manuals and technical guidance provided to PCA or FSA
        personnel.
    (6) 59 pages of correspondence containing guidance from FSA to the PCAs.
    (7) A 64-page sample of FSA's September 2015 Data Management and Fiscal Report.
    (8) 603 pages of wage garnishment and administrative offset borrower counts and fees
        paid to PCAs.
    (9) 1330 pages of PCA complaints.
    (10)  130 pages of communications related to the DOE's 2015 Dear Colleague letter
        regarding student loan collection fees.
    (11)  41 pages of an agreement between the DOE and the Department of Treasury
        regarding Treasury offset procedures.
    (12)  291 pages of the FSA PCA Procedures Manual.
    (13)  One page of PCA guidance.
    (14)  One page of a screen shot of the DOE's AWG system.
    (15)  One page of the DOE's AWG system field descriptions.
    (16)  2,660 pages of formulas underlying the DOE's AWG Hardship Calculator.
    The DOE redacted from some of the documents information exempt from disclosure under
    FOIA Exemptions 4, 5, 6, and 7(E). *Id.*

    Plaintiffs' Response: Undisputed.

11. The DOE withheld in full 131 pages of "source selection materials" related to PCA contracts
    under FOIA Exemptions 3 and 5. *Id.*, ¶ 12.

Plaintiffs' Response: Undisputed that ED invoked these two exemptions when it initially withheld the "source selection materials." However, ED's Vaughn Index states that it withholds the document in full pursuant only to Exemption 3 and Exemption 6 with respect to this document. Vaughn Index, ECF No. 45-3, at 7.

12. On February 13, 2017, the ACLU informed the DOE by letter that it was challenging "each and every" invocation of FOIA Exemption 5 and 7, whether asserted to withhold a record in part or in full. *Id.*, ¶ 13. The ACLU initially challenged the DOE's assertion of FOIA Exemption 4, excluding instances where Exemption 4 was asserted solely to protect "database codes" and "[PCA] employee names" from release. *Id.*[2] However, since those were the only bases of the Exemption 4 assertion, the DOE will not address Exemption 4 in this brief. The ACLU also challenged the DOE's decision to withhold in full 131 pages of "source selection materials" related to PCA contracts under FOIA Exemptions 3 and 5. *Id.* Despite repeated requests, the ACLU was unwilling to further explain the bases for these challenges. *Id.* The DOE has therefore been unable to engage in further negotiations with the Request as to the scope of these redactions. *Id.*

Plaintiffs' Response: Plaintiffs dispute the last two sentences of paragraph 12, stating that Plaintiffs were "unwilling" to explain the bases for their challenges and that ED therefore "unable" to negotiate further. Plaintiffs could not plausibly have explained the bases for their objections to withholding before ED had provided any information about its bases for withholding.

13. The DOE worked with the ACLU in good faith and believes the responses represent a full document production consistent with the Request and in accordance with the statute. *Id.*, ¶ 14.

Plaintiffs' Response: Undisputed that ED believes its responses are in accordance with the statute.

---

[2] As stated above, ACLU does not challenge DOE's Exemption 4 withholding as they protect databases, codes, and PSA employee names; thus, since that is the only bases for withholding by DOE, said Exemption is not discussed herein and DOE reserves its right to address Exemption 4 in this matter should the ACLU raise it in its papers.

**B. FSA Guidelines and Procedure**

14. The FSA is responsible for a range of functions across the student aid lifecycle, which include: educating students and families about the process of obtaining financial aid; processing millions of student financial aid applications; disbursing billions of dollars in student financial aid; insuring billions of dollars in guaranteed student loans previously issued by financial institutions; enforcing financial aid rules and regulations; servicing millions of student loans and helping borrowers avoid default; securing repayment from borrowers who have defaulted on their loans; and partnering with schools, financial institutions, and guaranty agencies to prevent program waste, fraud and abuse. *Id.*, ¶ 17.

     Plaintiffs' Response: Undisputed.

15. The FSA has the legal responsibility and authority under Title IV of the Higher Education Act of 1965 ("HEA") to effect the repayment of student loans in order to recoup the taxpayers' substantial investment in the higher education of student loan borrowers. *Id.*, ¶ 20.

     Plaintiffs' Response: Undisputed.

16. Loans in repayment are handled by servicers contracted by the DOE and incentivized to work with borrowers to keep them in a regular payment pattern and to prevent borrowers from going into default. *Id.*, ¶ 21. To this end, there are many Title IV benefits, flexibilities, and entitlements available to a borrower, such as deferments, forbearances, and a variety of repayment plans, including ones based on the borrower's income. *Id.* As reported in the FSA 2015 Annual Report, DOE servicers manage a $1.2 trillion portfolio representing the loans of 42 million borrowers, affecting 6,101 post-secondary institutions. *Id.,* ¶ 22.

     Plaintiffs' Response: Undisputed.

17. Borrowers are required to repay student loans even if the borrower does not complete their education, is unable to find a job or is unhappy with the education and paid for with the federal loan. *Id.*, ¶ 23.

     Plaintiffs' Response: Undisputed, although ED omits reference to the various options that

     statutes and regulations provide for borrowers unable to repay their loans, *see, e.g.*,

     Declaration of Persis Yu ("Yu Dec.")  ¶¶ 7, 12–14.

18. A borrower defaults on a student loan when they are 360 days delinquent on the loan. *Id.*, ¶ 24. Once an account goes into default, it enters the default system for collections, the borrower loses all Title IV benefits and, pursuant to the terms of the promissory note signed by every borrower, the total amount of the loan, plus interest, becomes immediately due and payable. *Id.* All resolutions of defaulted student loan accounts, other than immediate

7

payment in full, are compromise settlements agreed to at the discretion of FSA's Default Division.  *Id.*

Plaintiffs' Response: Plaintiffs dispute this paragraph. Statute, regulation, and the master promissory note that all student borrowers sign make clear that default occurs when a borrower has been delinquent for 270 days. Yu Dec. ¶ 9. Furthermore, borrowers do not lose all Title IV benefits upon default. For example, borrowers in default are eligible to have their loans cancelled if they are totally and permanently disabled, went to a school that closed while they were attending, or if their eligibility for the loan was falsely certified by the school. Borrowers also have the right to consolidate or rehabilitate their loans out of default. These programs are governed by statute and regulation, and are not discretionary on the part of FSA's Default Division. Yu Dec. ¶¶ 12−14.

19. FSA's Default Division is responsible for FSA's student loan default portfolio which totals more than $52 billion in loans made to more than four million borrowers.  *Id.*, ¶ 25.  The FSA Default Division manages the DOE's program to collect on defaulted student loans, and is responsible for review and oversight of FSA debt collection policies and procedures to ensure their compliance with applicable laws and regulations.  *Id.*

Plaintiffs' Response: Undisputed.

20. To carry out its statutory and regulatory law enforcement responsibilities to service student loans and to collect on defaulted student loans, the DOE contracts with loan servicers and PCAs.  *Id.*, ¶ 26.  Congress directed federal agencies to leverage the commercial marketplace to the maximum extent practicable in conducting government business. *Id.*

Plaintiffs' Response: Plaintiffs dispute the legal argument that the ED activity discussed constitutes "law enforcement."

21. As experts in their respective markets, these contractors, in concert with DOE officials are expected to follow DOE regulations and contract requirements as the necessary guidance to fulfill their contracted responsibilities and to exercise professional judgment in its enactment.  *Id.*, ¶ 27.

Plaintiffs' Response: Undisputed.

22. Specifically, in regard to PCAs, the DOE has developed procedures intended both to allow necessary FSA oversight of these contractors and to permit each PCA the flexibility needed to customize its collection work to achieve maximum recoupment of the defaulted loans owed to the taxpayers in accordance with all applicable laws. *Id.*, ¶ 28. These procedures and other PCA requirements are detailed in the PCA Procedures Manual. *Id.*

   Plaintiffs' Response: Undisputed.

23. The Internal Corrective Action Report is an internal Departmental document detailing recommended actions to be taken by the Department in response to the Final Audit Report of the Department's Office of Inspector General issued in July 2014, "Handling of Borrower Complaints Against Private Collection Agencies, Final Audit Report 1-2." *Id.*, ¶ 31.

   Plaintiffs' Response: Plaintiffs dispute that this document details "recommended actions to

   be taken," as the dates on the document itself make clear that the actions had already been

   taken. ED 1–5; *see* Plaintiffs' Br. at 21–22.

24. The PCA Contract Documents comprise the standard and current PCA contract (ED-FSA-09-O-0025). *Id.*, ¶ 32. This contract details the terms and obligations of the PCA's in their responsibilities on behalf of the Department, including pay rate information. *Id.* The Source Selection Materials identified in response to this request include information used in the Department's 2015 determination of contract award extensions for PCAs. *Id.*

   Plaintiffs' Response: Plaintiffs dispute the legal argument that these documents constitute

   Source Selection Information.

25. The June 27, 2016 Addendum to the PCA Agreement details guidance on Treasury Offset procedures. *Id.*, ¶ 33. The Treasury Offset Program is a centralized offset program, administered by the Bureau of the Fiscal Service's Debt Management Services (DMS), to collect delinquent debts owed to federal agencies and states (including past-due child support), in accordance with 26 U.S.C. § 6402(d) (collection of debts owed to federal agencies), 31 U.S.C. § 3720A (reduction of tax refund by amount of the debts), and other applicable laws. *Id.*

   Plaintiffs' Response: Undisputed.

26. As stated above, to carry out its statutory and regulatory law enforcement responsibilities to service student loans and to collect on defaulted student loans, the DOE contracts with loan servicers and PCAs. *Id.*, ¶ 34. The Federal Managers Financial Integrity Act, 31 U.S.C. § 3512, requires agencies to establish a system of internal controls to ensure the effectiveness and efficiency of operations, compliance with regulations, and applicable laws and the reliability of financial reporting. *Id.*

Plaintiffs' Response: Undisputed.

27. The DOE extends that requirement to its contractors through the establishment of internal controls designed to ensure its contractors are abiding by applicable laws and regulations in the enforcement of its policies and procedures. *Id.*, ¶ 35. Loan collection policies include but are not limited to privacy protections, and activities further detailed in the Fair Debt Collection Practices Act, 15 U.S.C. § 1692. *Id.*

Plaintiffs' Response: Undisputed.

28. The documents provided in response to this request include internal communications between DOE employees and contractor staff regarding individual loan collection issues, as well as internal deliberative communications in advance of loan collection policy development. *Id.*, ¶ 36. The DOE also identified as responsive specific information related to how the DOE collects loans through the PCA and FSA Participants Manuals, the Technical Procedures on AWG Processing, and the PCA Procedures Manual. *Id.*, ¶ 37. Over the years, FSA's Default Division has developed these manuals and procedures to instruct the PCAs on their interactions with FSA's Default Division and borrowers. *Id.*, ¶ 38. These manuals and procedures set out the DOE's requirements for the PCAs' interactions with FSA and borrowers to ensure consistency in their collection practices and FSA's operational requirements. *Id.*, ¶ 39.

Plaintiffs' Response: Undisputed.

29. The manuals and procedures are not publicly available, and FSA has shared it only with the PCAs who have a prime contract with the DOE and relevant Department employees. *Id.*, ¶ 40. FSA provides for the confidentiality of this document in both the terms of the PCA contract and a confidentiality notice. *Id.* Section 6.2.7 of the contract states:" The contractor shall ensure that sensitive information shall not be released outside control of the organization." *Id.* Moreover, the entire Manual is covered by the following notice on each page "Distribution authorized to the Department of Education and its Private Collection Agency contractors only." *Id.*

Plaintiffs' Response: Plaintiffs dispute this paragraph. The PCA manual was posted and publicly available on the ED website until it was removed in 2010, in the wake of negative media attention regarding the manual. Yu Dec. ¶¶ 30–31.

## C. FOIA Exemptions 3, 5, 7(C), and 7(E)

30. All information withheld pursuant to the Request is exempt from disclosure in accordance with specific FOIA exemptions. *See* 5 U.S.C. § 552(b); Pedersen Decl., ¶¶ 43-60.

Plaintiffs' Response: Plaintiffs dispute the legal argument that this material is exempt from

disclosure and submit their brief containing legal arguments on that point.

31. FOIA Exemption 3 protects from disclosure information prohibited from disclosure by
another federal statute where that statute either "(A) requires that the matter be withheld from
the public in such a manner as to leave no discretion on the issue, or (B) establishes particular
criteria for withholding or refers to particular types of matters to be withheld."  5 U.S.C. §
552(b)(3); Pedersen Decl., ¶ 43.

Plaintiffs' Response: Undisputed.

32. Under Exemption 3, the DOE withheld in full "source selection materials" for PCA
contractual bids, prohibited from disclosure pursuant to the Program Integrity Act, which
provides that federal agencies "shall not, other than as provided by law, knowingly disclose
contractor bid or proposal information or source selection information before the award of a
Federal agency procurement contract to which the information relates."  41 U.S.C. §
2102(a)(2).  Pedersen Decl., ¶¶ 44-45.  These "source selection materials" were generated
prior to Departmental determinations on awarding contract extension, and, thus, prohibited
from disclosure. *Id.,* ¶ 45.

Plaintiffs' Response: Plaintiffs dispute the legal argument that this material is exempt from

disclosure and submit their brief containing legal arguments on that point.

33. FOIA Exemption 5 protects "inter-agency or intra-agency memorandums or letters which
would not be available by law to a party other than an agency in litigation with the agency."
5 U.S.C. § 552(b)(5); Pedersen Decl., ¶ 46.  Exemption 5 encompasses the deliberative
process, attorney-client, and attorney work product privileges.  *See* Pedersen Decl., ¶ 46.  The
DOE withheld certain records, in whole or in part, pursuant to the privileges housed within
Exemption 5.[3]  *Id.*

Plaintiffs' Response: Undisputed.

34. The DOE withheld, in part, under Exemption 5's deliberative process privilege an internal
document detailing recommended actions to be taken by the DOE in light of an Internal
Report issued by the Office of Inspector General.  *Id.*, ¶ 47.  The redacted portions are pre-
decisional and contain proposals on how the DOE might best respond to the deliberative
report.  *Id.*  The DOE also withheld under the deliberative process privilege portions of
internal communications analyzing the DOE's collection methods as applied by PCAs and
developing Frequently Asked Questions related to collection fees.  *Id.*, ¶ 48.  These
deliberations are part of the DOE's process of creating future collection policies.  *Id.*  The
DOE also redacted from e-mails among DOE employees and between the DOE and its loan

---

[3] The information withheld pursuant to Exemption 5 is identified in the *Vaughn* Index
attached as Exhibit B to Pedersen Decl.

servicers discussions concerning the appropriate response to borrowers' requests for assistance and the processing of particular borrowers' claims. *Id*., ¶ 49. The discussions were deliberative in nature and conducted prior to a final decision with respect to a particular borrower issue. *Id.* The disclosure of this information would have a chilling effect on the DOE's ability to deliberate candidly and openly while formulating policy decisions and other determinations and, in some instances, might confuse and mislead the public because certain of the redacted information includes reasoning that was not ultimately adopted by the DOE. *Id.*

Plaintiffs' Response: Plaintiffs dispute the legal argument that this material is exempt from

disclosure and submit their brief containing legal arguments on that point.

35. Pursuant to the attorney work product privilege under Exemption 5, the DOE withheld sections of the May 2016 PCA Procedures Manual that provide guidance for attorneys in connection with the preparation of a certificate of indebtedness and a claims collection litigation report in advance of litigation. *Id*., ¶ 50. This information contains legal analysis and strategies to support the DOE attorneys' handling of AWG hearings and prosecution of collections actions. *Id*.

Plaintiffs' Response: Plaintiffs dispute the legal argument that this material is exempt from

disclosure and submit their brief containing legal arguments on that point. Plaintiffs further

dispute that the PCA Procedures Manual is "for attorneys" and that it contains "legal analysis

and strategies to support the DOE attorneys'" actions. *See* Br. at 25–26 and sources cited

therein.

36. The DOE also invoked Exemptions 7(C) and (E), dealing with information compiled for law enforcement purposes. *See id*., ¶¶ 51-60. The FSA is responsible for effecting the repayment of student loans distributed under the student federal assistance programs authorized under Title IV of the HEA. *Id*., ¶ 57. To carry out that mandate, the Department contracts with PCAs and loan servicers and works with federal prosecutors and other attorneys to enforce collection of debts resulting from non-payment of student loans and grant overpayments in compliance with other statutes generally governing debt collection activities. *Id*. Further, the PCA Procedures Manual is used in the DOE's effort to collect on a defaulted federal debt through collections actions, litigation, or administrative wage garnishment. *Id*., ¶ 59. As such, it was created and compiled for the law enforcement purpose of collecting on the defaulted debt. *Id*.

Plaintiffs' Response: Plaintiffs dispute the legal argument that this material is exempt from

disclosure and submit their brief containing legal arguments on that point.

37. Exemption 7(C) provides protection for personal information in law enforcement records, the disclosure of which "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 52(b)(7)(C).  *See* Pedersen Decl., ¶ 51.  The DOE applied Exemptions 6 and 7(C) to the names of the employees of the PCAs contained in the PCA Procedures Manual.[4]   *See* Pedersen Decl., ¶ 52.  The PCA Procedures Manual is a document compiled for law enforcement purposes and contains guidelines with respect to the enforcement of the collection debt from borrowers who have defaulted on their student loans. *Id*., ¶ 54.

Plaintiffs' Response: Undisputed for purposes of this litigation.

38. Exemption 7(E) protects "records or information compiled for law enforcement purposes" to the extent the production of the records or information would disclose "guidelines for law enforcement investigations or prosecutions" the disclosure of which "could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  *See* Pedersen Decl., ¶ 56.  The DOE has withheld under Exemption 7(E) guidelines for the enforcement of debt collection from borrowers who have not timely repaid their student loans and are in default, the disclosure of which could allow borrowers and companies marketing their services to borrowers to determine ways to continue to delay or avoid repayment of their loans.[5]  *Id.*

Plaintiffs' Response: Plaintiffs dispute the legal argument that this material is exempt from

disclosure and submit their brief containing legal arguments on that point.

39. The DOE has withheld under Exemption 7(E) the guidelines the DOE provides to its contractors and attorneys in connection with the enforcement of borrowers' obligations to pay their student loans.  *Id*., ¶ 58.  Specifically, the DOE withheld from the PCA Contract Documents, Analysis of PCA Collection Methods, AWG Technical Procedures and PCA Procedures Manual certain details of the processes used by PCAs to collect defaulted student loans, including enforcement strategies, payment procedures, and compromise guidelines. *Id*. Finally, the DOE has withheld (c) portions of an Addendum to an Agreement between the DOE and the Department of the Treasury regarding Treasury Off-Set Procedures, which sets

---

[4] For specific withholdings pursuant to Exemption 7(C), *see Vaughn* Index, Exhibit B to Pedersen Decl.  As mentioned above, Exemptions 6 and 7(C) both provide that government documents may be withheld where their disclosure would cause an "unwarranted invasion of personal privacy."  *See* 5 U.S.C. § 552(b)(6), (b)(7)(C ); *U.S. Dep't of State v. Ray*, 502 U.S. 164, 174-75 (1991).  Specifically, Exemption 6 states that FOIA does not apply to "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  § 552(b)(6).  Because the ACLU does not challenge the DOE's use of Exemption 6 to protect disclosure of these names, the DOE will not address either Exemption 6 or 7(C) in this brief.  However, should the ACLU challenge DOE's use of either Exemption, DOE reserves its rights to discuss the applicability of these Exemptions in its Reply.

[5] For specific withholdings pursuant to Exemption 7(E), *see Vaughn* Index attached as Exhibit B to Pederson Decl.

forth guidelines by which the agencies enforce student loan repayment through non-voluntary collections.  *Id*.  All of this information constitutes the sort of law enforcement guidelines contemplated by Exemption 7(E).  *Id*.

Plaintiffs' Response: Plaintiffs dispute the legal argument that this material is exempt from disclosure and submit their brief containing legal arguments on that point.

## Plaintiffs' Local Rule 56.1 Statement of Undisputed Facts in Support of their Cross-Motion for Summary Judgment

40. More than 42 million Americans have federal student loan debt, totaling $1.3 trillion. Declaration of Persis Yu ("Yu Dec.") ¶ 2.

41. Over $137 billion of that debt is in default. Yu Dec. ¶ 3.

42. The federal student loan program is authorized by the Higher Education Act (HEA), 20 U.S.C. § 1070 et seq., which also establishes interest rates, flexible repayment options, cancellation programs, and programs to help borrowers get out of default. The HEA also makes ED responsible for the HEA's implementation. Yu Dec. ¶ 4.

43. Borrowers in good standing on their loans have a right to flexible repayment plans, such as income-based repayment, as well as deferments and forbearances for a variety of reasons such as financial hardship or military status. Yu Dec. ¶ 7.

44. When students or their parents take out a federal loan, they sign a master promissory note that incorporates by reference their rights under the HEA. Yu Dec. ¶ 5.

45. ED holds the vast majority of outstanding student loan debt, so that its policies and practices for servicing and collecting federal student debt have tremendous consequences for student-borrowers. Yu Dec. ¶ 6.

The Department of Education and Private Collection Agencies

46. Federal Student Aid (FSA) is ED entity responsible for administering the federal student aid program. It relies on private companies to service ED held loans that are in good standing. Yu Dec. ¶ 8.

47. When a student borrower is 270 days delinquent on a loan, that loan is considered to be in default, and the account is subsequently transferred back from the loan servicer to ED. Yu Dec. ¶ 9.

48. ED then refers every eligible defaulted student loan debt to one of the Private Collection Agencies (PCAs) with which it contracts. Yu Dec. ¶ 10.

49. PCAs are debt collectors, and their remuneration depends upon the option selected by the borrower. Yet, ED contracts with PCAs not only to collect money, but also to communicate with borrowers about options to resolve their debt. Yu Dec. ¶ 11.

Defaulted Borrowers' Options

50. Although borrowers lose eligibility for some programs after falling into default, there are some programs to which student loan borrowers remain entitled regardless of the status of their loans. For example, borrowers in default are eligible to have their loans cancelled if they are totally and permanently disabled, if they went to a school that closed while they were attending, or if their eligibility for the loan was falsely certified by the school. The benefits of these programs and the eligibility guidelines are outlined in statute and regulation. 20 U.S.C. § 1087; 34 CFR §§ 682.402, 685.212, 685.213, 685.214, 685.215, 685.216; Yu Dec. ¶ 12.

51. Borrowers can get out of default through either loan consolidation or rehabilitation. 20 U.S.C. § 1078-6; 34 CFR §§ 682.405, 685.211, 685.220; Yu Dec. ¶ 13.

52. Borrowers can emerge from default through consolidation by making three "reasonable and affordable" payments or by agreeing to repay their loans on an income-driven plan. Yu Dec. ¶ 14.

53. Borrowers can also emerge from default through rehabilitation by making nine on-time "reasonable and affordable" payments based on their financial circumstances. Yu Dec. ¶ 14.

54. ED's commission structure provides PCAs with incentives to steer borrowers toward options that yield the highest commission for the PCAs, although the PCAs are supposed to counsel each borrower about the most appropriate option for his or her individual circumstances. Yu Dec. ¶ 15.

Agency Oversight of PCAs

55. Serious questions have been raised about ED's oversight of PCAs. In 2014, ED's Office of Inspector General (OIG) found that ED did not "effectively ensure that [PCAs] are abiding by the Federal debt collection laws and the related terms of their contractual agreements," and that ED failed to incorporate borrower complaints into its oversight of the collection agencies. Yu Dec. ¶ 16–17.

56. 2014 Government Accountability Office (GAO) testimony to Congress expressed substantial doubts about ED's oversight of PCAs. Yu Dec. ¶ 18.

57. The GAO found that ED did not utilize a PCA's record of borrower complaints or service quality into its evaluation of PCAs, although it had the authority to do so. Yu Dec. ¶¶ 19–20.

58. ED continues to grant new contracts to PCAs that it found to have "made materially inaccurate representations" to borrowers about their options. Yu Dec. ¶¶ 21–22.

59. Plaintiff National Consumer Law Center (NCLC) continues to document problems related to ED's oversight of PCAs and bring these problems to ED's attention. Yu Dec. ¶ 23.

60. A recent opinion piece in the N.Y. Times noted that ED places borrowers at risk by failing to monitor its contractors. Yu Dec. ¶ 24.

Disproportionate Impact of Student Debt Collection on Communities of Color

61. These failures in oversight have particular impacts on student loan borrowers of color, because they both bear disproportionately large debt burdens and are at increased risk of exposure to delinquency and default. Yu Dec. ¶ 25.

62. Compared to white adults, Black adults are approximately twice as likely to hold student debt, and Latino adults are about 1.75 times as likely. Yu Dec. ¶ 26.

63. Borrowers of color are more likely to experience delinquency or default. One study found that compared to their white peers, the default rate for Black students ten years after graduation was more than five times as high, and the rate for Latino students was more than twice as high. Yu Dec. ¶¶ 27–28.

64. As a result, borrowers of color are disproportionately at risk of being subject to the costs of default, as well as forced collection through administrative wage garnishment, seizure of federal benefits or tax refunds, and other damaging debt collection practices. Yu Dec. ¶ 29.

ED's Decision to Remove the PCA Manual from Public View

65. Until 2010, the PCA Manual at issue in this litigation was available publically on the ED website. ED removed the PCA Manual from the website after it received press attention. Yu Dec. ¶¶ 30–31.

Plaintiffs' FOIA Request and ED's Response

66. On May 7, 2015, ACLU and NCLC filed a FOIA request with ED seeking information about ED's relationship with PCAs, the policies that govern PCAs' debt collection activities, and the way that PCAs are compensated for those collection activities. Plaintiffs also sought

17

information concerning ED's policies, if any, for monitoring the particular impacts of student debt on communities of color. Yu Dec. ¶ 32.

67. On May 21, 2015, after acknowledging receipt of the request, ED denied the request for expedited processing and granted the fee waiver. Yu Dec. ¶ 34.

68. On September 14, 2015, more than four months after the initial Request was sent, Plaintiffs sent an email to ED inquiring as to when production might be expected. Yu Dec. ¶ 35.

69. After several more emails from Plaintiffs, ED produced a first interim response on December 3, 2015, nearly six months after the initial request. This initial response contained records responsive to only one of ACLU's requests and information responsive to five other requests. Yu Dec. ¶¶ 36–37.

70. Plaintiffs and ED exchanged several emails during December, January, and early February discussing outstanding aspects of the Request. Yu Dec. ¶ 38.

71. On February 10, 2016, Plaintiffs sent ED a letter stating that, nearly nine months after the filing of the Request, Plaintiffs had not received a final determination and could therefore seek judicial action to compel disclosure. Plaintiffs asked that ED provide them with a written final determination on all twenty elements of their Request by March l, 2016. Yu Dec. ¶ 39.

72. On March 4, 2016, ED produced a second interim response. In a letter accompanying the response, ED noted that it had "outstanding responsive documents" in its possession and that the responses did not constitute or include a final determination pursuant to 5 U.S.C. § 552(a)(6)(C)(i). Yu Dec. ¶ 40.

73. On March 30, 2016, nearly eleven months after filing their Request and still lacking a final response from ED, Plaintiffs filed this lawsuit to enforce the public's right to information about ED's student debt collection practices. Yu Dec. ¶ 41.

74. In multiple June 2016 emails and phone calls, ED acknowledged that responsive documents were outstanding. In a June 22, 2016 email, ED informed ACLU that it would produce the outstanding documents during the week of July 4, 2016. Yu Dec. ¶¶ 42–43.

75. ED did not produce any documents during the week of July 4, 2016. Yu Dec. ¶ 44.

76. On July 15, 2016, ACLU sent a letter to ED inquiring about the status of the outstanding documents and requested that ED produce the documents no later than July 22, 2016 so they could be reviewed before the August 4, 2016 status conference. Yu Dec. ¶ 45.

77. ED produced its third interim response on August 3, 2016. Yu Dec. ¶ 46.

78. On August 23, 2016, ACLU and ED participated in a conference call to discuss production of documents that still remained outstanding. ED agreed to provide further information on the outstanding requests by September 12, 2016. Yu Dec. ¶ 47.

79. ED did not provide any additional information before September 12, 2016. Yu Dec. ¶ 48.

80. ED produced additional responsive documents on September 21, 2016. Yu Dec. ¶ 49.

81. On September 30, 2016, parties filed a Joint Status Report indicating that ED would provide ACLU with the documents both parties agreed were outstanding on the August 23, 2016 conference call, by October 28, 2016. The parties agreed, based on that date, that ED's opening summary judgment brief would be due on January 13, 2017. ECF No. 35; Yu Dec. ¶ 50.

82. Although ED produced additional documents in October and November, it did not produce all of the documents it had agreed to produce in the Joint Status Report and August 23, 2016 conference call. Yu Dec. ¶ 51.

83. On January 6, 2017, counsel for ED sought Plaintiffs' consent to a ninety-day extension of the summary judgment schedule. Plaintiffs eventually agreed, contingent upon ED's commitment to producing additional information by February 6, 2017. Yu Dec. ¶ 52.

84. On February 3, 2017, ED produced some—but not all—of that additional information. Yu Dec. ¶ 53.

85. After additional correspondence, on April 17, 2017, ED produced its final set of responsive documents. Yu Dec. ¶ 54.

86. On April 25, 2017, Plaintiffs received the Bates numbered versions of the documents that ED had produced and that are at issue in this summary judgment motion. Yu Dec. ¶ 55.


Dated: May 16, 2017

                                             Respectfully submitted,


                                             /s/ Rachel E. Goodman
                                             Rachel E. Goodman
                                             Dennis D. Parker
                                             Sarah A. Hinger
                                             American Civil Liberties Union
                                                 Foundation
                                             125 Broad Street, 18th Fl.
                                             New York, NY 10004
                                             (212) 549-2500
                                             rgoodman@aclu.org

                                             Matthew R. Segal, BBO No. 654489
                                             Rahsaan D. Hall, BBO No. 645369
                                             Jessie J. Rossman, BBO No. 670685
                                             Laura Rótolo, BBO No. 665247

American Civil Liberties Union
    Foundation of Massachusetts
211 Congress Street
Boston, MA 02110
(617) 482-3170 ex. 337
jrossman@aclum.org

Stuart Rossman, BBO No. 430640
Persis S. Yu, BBO No. 685951
National Consumer Law Center
7 Winthrop Square, 4th Floor
Boston, MA 02110
(617) 542-8010
srossman@nclc.org

*Attorneys for Plaintiffs*