UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____  )
AMERICAN CIVIL LIBERTIES UNION            )
FOUNDATION, INC.,                         )
AMERICAN CIVIL LIBERTIES UNION            )
AND                                       )
NATIONAL CONSUMER LAW CENTER              )
                                          )
    Plaintiffs,                           )
                                          )
    v.                                    )    Civil Action No.:  16-10613-ADB
                                          )
                                          )
UNITED STATES DEPARTMENT OF               )
EDUCATION                                 )
                                          )
    Defendant.                            )
_____  )

**DECLARATION OF PERSIS YU
IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I, PERSIS YU, declare:

1. I am a staff attorney at the National Consumer Law Center (NCLC) and co-counsel for the Plaintiffs. I am a member in good standing of the Bar of the State of Massachusetts, and I am admitted to practice in this Court. I submit this declaration in support of Plaintiffs' Cross-Motion for Summary Judgment and in opposition to Defendants' Motion for Summary Judgment. I have personal knowledge of the statements contained in this declaration, and if called upon to testify, I could and would testify competently to them.

2. More than 42 million Americans have federal student loan debt, totaling $1.3 trillion dollars. *See* Exhibit 1, U.S. Dep't of Educ., Federal Student Aid Office, Federal

1

Student Aid Portfolio Summary, https://studentaid.ed.gov/sa/about/data-center/student/portfolio.

3. Over $137 billion of that debt is in default. *See* Exhibit 2, U.S. Dep't of Educ., Federal Student Aid Office, Portfolio by Loan Status, https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/library/PortfoliobyLoanStatus.xls.

4. The federal student loan program is authorized by the Higher Education Act (HEA) of 1964. 20 U.S.C. § 1070 et seq. Among other things, the HEA establishes student loan interest rates, flexible repayment options, cancellation programs, and programs to help borrowers get out of default. 20 U.S.C. § 1087e. The Department of Education (ED) is responsible for implementation of the HEA. 20 U.S.C. § 1070(b).

5. Students or their parents may apply for federal student loans to assist in paying for the student's education. Upon taking out the loan, student loan borrowers sign a promissory note. Borrowers' rights under the HEA are incorporated by reference into the Master Promissory Note that each borrower executes. *See* Exhibit 3, Master Promissory Note for Direct Subsidized Loans and Direct Unsubsidized Loans, William D. Ford Federal Direct Loan Program, OMB No. 1845-0007, http://www.studentloanborrowerassistance.org/wp-content/uploads/File/DirectStaffordMPN_1.pdf.

6. ED holds the vast majority of outstanding student loan debt, so that its policies and practices for servicing and collecting federal student debt have tremendous consequences for student-borrowers.

7. Borrowers in good standing on their loans have a right to flexible repayment plans, such as income-based repayment, as well as deferments and forbearances for a variety of reasons such as financial hardship or military status. 20 U.S.C. § 1087e; 34 C.F.R. §§ 682.209, 682.210, 682.211, 682.215, 685.204, 685.205, & 685.208.

   The Department of Education and Private Collection Agencies

8. Federal Student Aid (FSA) is the entity in ED responsible for administering the federal student aid program. FSA relies on private companies to service ED-held loans that are in good standing. These companies are responsible for properly processing borrowers' payments and ensuring that borrowers are able to access the programs they are entitled to under the HEA.

9. By statute, when a student loan borrower is 270 days delinquent on a loan, that loan is considered to be in default. 34 C.F.R. §§ 682.200 (FFEL definition of default), 685.102(b) (definition of Direct Loan program); Exhibit 3, at 2. At that point a borrower is no longer eligible to take out additional Title IV funds, or to utilize the flexible repayment plans or deferments. At some point after the borrower has been delinquent for 270 days, the account is transferred back to ED.

10. ED refers every eligible defaulted student loan debt to one of the Private Collection Agencies (PCAs) with which it contracts. *See* Exhibit 4, U.S. Dep't of the Treasury, U.S. Government Receivables and Debt Collection Activities of Federal Agencies: Fiscal Year 2008 Report to the Congress 14 (July 2009), https://www.fms.treas.gov/news/reports/debt08.pdf.

11. PCAs are debt collectors, and their remuneration depends upon the option selected by the borrower. Yet, according to its own website, ED contracts with PCAs not only to

collect money, but also to communicate with borrowers about options to resolve their debt. *See* Exhibit 5, U.S. Dep't of Educ., Federal Student Aid, Private Collection Agency Contracts, https://studentaid.ed.gov/sa/about/data-center/business-info/contracts/collection-agency (saved on May 12, 2017).

Defaulted Borrowers' Options

12. Although borrowers lose eligibility for some programs after falling into default, there are some programs to which student loan borrowers remain entitled regardless of the status of their loans. For example, borrowers in default are eligible to have their loans cancelled if they are totally and permanently disabled, went to a school that closed while they were attending, or if their eligibility for the loan was falsely certified by the school. The benefits of these programs and the eligibility guidelines are outlined in statute and regulation. 20 U.S.C. § 1087; 34 C.F.R. §§ 682.402, 685.212, 685.213, 685.214, 685.215, & 685.216.

13. The HEA provides specific rights for borrowers wanting to get their loans out of default and back into good standing. Specifically, borrowers can get out of default through either loan consolidation or rehabilitation. 20 U.S.C. § 1078-6; 34 C.F.R. §§ 682.405, 685.211, & 685.220.

14. The statute and regulations permit a borrower to consolidate out of default by either making three "reasonable and affordable" payments, or by agreeing to repay their loan utilizing one of the income-driven repayment plans. 20 U.S.C. § 1078-3(a)(3)(A)(ii)(III); 34 C.F.R. § 685.220(d)(1)(ii)(A)(3); 34 C.F.R. § 685.102(b). Borrowers can also rehabilitate their loans by making nine on-time, "reasonable and affordable" payments within a 10-month period, with payment amounts based upon

borrowers' financial circumstances. 20 U.S.C. § 1078-6(a); 34 C.F.R. §§ 682.405(a)(2); 685.211(f).

15. PCAs are supposed to counsel each borrower about the most appropriate option for that borrower's circumstances, including about these programs to cure default. However, ED's commission structure provides incentives to steer borrowers toward programs that garner the highest commissions for the PCAs. *See* Exhibit 6, National Consumer Law Center, Pounding Student Loan Borrowers: The Heavy Costs of the Government's Partnership with Debt Collection Agencies, 10–17 (Sept. 2014), http://www.studentloanborrowerassistance.org/wp-content/uploads/2013/05/report-sl-debt-collectors.pdf.

 Agency Oversight of PCAs

16. Serious questions have been raised about ED's oversight of PCAs.

17. In 2014, ED's Office of Inspector General (OIG) found that ED did not "effectively ensure that [PCAs] are abiding by the Federal debt collection laws and the related terms of their contractual agreements," and that ED failed to incorporate borrower complaints into its oversight of the collection agencies. *See* Exhibit 7, U.S. Dep't of Educ., Office of the Inspector Gen., Handling of Borrower Complaints Against Private Collection Agencies: Final Audit Report (ED-OIG/A06M0012) 7 (July 2014), https://www2.ed.gov/about/offices/list/oig/auditreports/fy2014/a06m0012.pdf.

18. In 2014, testimony by the U.S. Government Accountability Office (GAO) to Congress stated that ED's oversight provided "little assurance that borrowers are provided accurate information. . ." *See* Exhibit 8, United States. Cong. House. Subcomm. on Higher Education and Workforce Training, Committee on Education and the

5

    Workforce (Statement of Melissa Emret-Arras, Director, Education, Workforce, and Income Security, GAO, Federal Student Loans, Oversight of Defaulted Loan Rehabilitation Needs Strengthening) 8 (Mar. 12, 2014), http://www.gao.gov/assets/670/661591.pdf.

19. Although ED has the authority and contractual right to do so, the OIG report revealed that ED does not factor "service quality" into its quarterly evaluations of PCAs. *See* Exhibit 7 at 15–16.

20. According to the PCA contracts, points should be deducted from a PCA's performance score when ED receives multiple similar borrower complaints about an issue that ED considers to be a concern. Nonetheless, OIG reported that ED had never deducted points from a PCA's score after instructing the PCA to correct the concerning conduct. *See* Exhibit 7 at 15–16.

21. In 2015, ED appeared to take an important step toward protecting borrowers. In a press release, ED stated that it terminated the contracts of five PCAs whose agents "made materially inaccurate representations" to borrowers about the options for resolving their defaulted student loans. *See* Exhibit 9, U.S. Dep't of Educ., U.S. Department of Education to End Contracts with Several Private Collection Agencies, (Feb. 27, 2015), https://www.ed.gov/news/press-releases/us-department-education-end-contracts-several-private-collection-agencies.

22. However, ED has since announced in a court filing that it will grant new contracts to those PCAs. *See* Exhibit 10, *Coast Professional, Inc. v. United States*, No. 15-207C, ECF No. 231, 1, Fed. Cl. (filed Apr. 28, 2017).

23. NCLC continues to document problems related to ED's management of PCAs and how PCAs treat borrowers, forwarding documentation to ED's attention.

24. As an opinion piece in the New York Times recently pointed out, borrowers are "locked in with the contractor assigned to them by the Education Department; if the government does not monitor these companies, borrowers are at risk." *See* Exhibit 11, Susan Dynarski, N.Y. Times, The Wrong Way to Fix Student Debt, (May 6, 2017), https://www.nytimes.com/2017/05/06/upshot/the-wrong-way-to-fix-student-loans.html.

Disproportionate Impact of Student Debt Collection on Communities of Color

25. Failures in oversight are particularly significant for student loan borrowers of color because of their disproportionately large debt burdens and the racial wealth gap that contributes to their increased risk of exposure to delinquency and default. To the extent that PCAs do not comply with federal law or contractual requirements for treating borrowers fairly, borrowers of color will continue to pay the price.

26. According to a report by the Urban Institute, compared to white adults, Black adults are approximately twice as likely to hold student debt, and Latino adults are about 1.75 times as likely. *See* Exhibit 12, Caroline Ratcliffe & Signe-Mary McKernan, Forever in Your Debt: Who Has Student Loan Debt, and Who's Worried? 2 (June 2013), http://www.urban.org/sites/default/files/publication/23736/412849-Forever-in-Your-Debt-Who-Has-Student-Loan-Debt-and-Who-s-Worried-.PDF.

27. Moreover, the Consumer Financial Protection Bureau has found that borrowers of color are more likely to experience delinquency or default. *See* Exhibit 13, Aissa Canchola & Seth Frotman, The Significant Impact of Student Debt on Communities of

Color, (Sep. 15, 2016), https://www.consumerfinance.gov/about-us/blog/significant-impact-student-debt-communities-color/.

28. A 2007 study found that compared to their white peers, the default rate for Black students ten years after graduation was more than five times as high, and the rate for Latino students was more than twice as high. *See* Exhibit 14, National Consumer Law Center, The Student Loan Default Trap 14 (Jul. 2012) (citing Erin Dillon, A Closer Look at Student Loan Default Rates, Education Sector (Oct. 23, 2007)), http://www.studentloanborrowerassistance.org/wp-content/uploads/2013/05/student-loan-default-trap-report.pdf.

29. Disparities in federal student loan default rates disproportionately expose borrowers of color to the challenge of paying the additional fees generated in default, as well as forced collection through administrative wage garnishment, seizure of federal benefits or tax refunds, and other damaging debt collection practices.

<u>ED's Decision to Remove the PCA Manual from Public View</u>

30. For years, the PCA manual was publicly available on the ED website.

31. In the spring of 2010, after several news stories and blogs described problems with the PCA manual, ED removed the PCA manual from its website. *See* Exhibit 15, Ariel Wittenberg, Center for Public Integrity*,* Education Department Pulls Student Debt Collectors Guide Off Website, (Jun. 10, 2010), https://www.publicintegrity.org/2010/06/16/2644/education-department-pulls-student-debt-collectors-guide-website.

Plaintiffs' FOIA Request and ED's Response

32. On May 7, 2015, ACLU and NCLC filed a FOIA request with ED seeking information about ED's relationship with PCAs, the policies that govern PCAs' debt collection activities, and the way that PCAs are compensated for those collection activities. Plaintiffs also sought information concerning ED's policies, if any, for monitoring the particular impacts of student debt on communities of color. ECF No. 2.

33. On May 11, 2015, ED acknowledged receipt of the Request.

34. On May 21, 2015, ED denied the request for expedited processing and granted the fee waiver.

35. On September 14, 2015, more than four months after the initial Request was sent, Plaintiffs sent an email to ED inquiring as to when production might be expected.

36. On September 15, 2015, ED sent a reply email acknowledging the "long" delay and stating their intention to produce an initial release in the "next couple of weeks."

37. After two more follow-up emails from the Plaintiffs, ED produced a first interim response on December 3, 2015, nearly six months after the initial request. This initial response contained records responsive to only one of ACLU's requests and information responsive to five other requests.

38. Plaintiffs and ED exchanged several emails during December, January, and early February discussing outstanding aspects of the Request.

39. On February 10, 2016, Plaintiffs sent ED a letter stating that, nearly nine months after the filing of the Request, Plaintiffs had not received a final determination and could therefore seek judicial action to compel disclosure. Plaintiffs asked that ED provide

them with a written final determination on all twenty elements of their Request by March l, 2016.

40. On March 4, 2016, ED produced a second interim response. In a letter accompanying the response, ED noted that it had "outstanding responsive documents" in its possession and that the responses did not constitute or include a final determination pursuant to 5 U.S.C. § 552(a)(6)(C)(i).

41. On March 30, 2016, nearly eleven months after filing their Request, Plaintiffs filed this lawsuit to enforce the public's right to information about ED's student debt collection practices.

42. In a telephone call memorialized in a June 3, 2016 email, Plaintiffs informed ED that they had not yet received outstanding documents ED had identified as responsive in the March 4, 2016 interim release. ACLU requested that ED produce those documents by June 30, 2016.

43. In multiple June 2016 emails, ED acknowledged that responsive documents were outstanding. In a June 22, 2016 email, ED informed ACLU that it would produce the outstanding documents during the week of July 4, 2016.

44. ED did not produce any documents during the week of July 4, 2016.

45. On July 15, 2017, ACLU sent a letter to ED inquiring about the status of the outstanding documents and requested that ED produce the documents no later than July 22, 2016 so they could be reviewed before the August 4, 2016 status conference.

46. ED produced documents on August 3, 2016.

47. On August 23, 2016, ACLU and ED participated in a conference call to discuss production of documents that still remained outstanding. ED agreed to provide further information on the outstanding requests by September 12, 2016.

48. ED did not provide any additional information before September 12, 2016.

49. ED produced additional responsive documents on September 21, 2016.

50. On September 30, 2016, parties filed a Joint Status Report, ECF No.35, indicating that ED would provide ACLU with the documents both parties had agreed were outstanding on the August 23, 2016 conference call, by October 28, 2016. The parties agreed, based on that date, that ED's opening summary judgment brief would be due on January 13, 2017.

51. On October 28, 2016 and November 23, 2016, ED produced some—but not all—of the documents it had agreed to produce in the Joint Status Report and August 23 conference call.

52. On January 6, 2017, counsel for ED sought Plaintiffs' consent to a ninety-day extension of the summary judgment schedule. Plaintiffs eventually agreed, contingent upon ED's commitment to producing additional information by February 6, 2017.

53. On February 3, 2017, ED produced some—but not all—of that additional information.

54. After additional correspondence, on April 17, 2017, ED produced its final set of responsive documents.

55. On April 25, 2017, Plaintiffs received the Bates numbered versions of the documents that ED had produced and that are at issue in this summary judgment motion.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 16, 2017

_____
Persis Yu